UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
JOSE VILLALBA,                                                     :    02-CV-4455 (ARR)(RML)
                Plaintiff,                                :
                                                                   :
    -against-                                                    :    NOT FOR ELECTRONIC
                                                                   :    OR PRINT
ROCKFORD SYSTEMS, INC., STAMPTECH, INC.,                           :    PUBLICATION
and NEWELL INDUSTRIES, INC.,                                       :
                Defendants.                               :    ORDER
                                                                   :
------------------------------------------------------------------ X

ROSS, United States District Judge:

        I have received the Report and Recommendation on the instant case dated February 10, 2006 from the Honorable Robert M. Levy, United States Magistrate Judge. No objections have been filed. Having conducted a de novo review of the record, I hereby adopt the Report and Recommendation, in its entirety, as the opinion of the Court pursuant to 28 U.S.C. § 636(b)(1). Accordingly, the court awards plaintiff $305,000 in compensatory damages. This amount includes $82,000 in past lost wages, $50,000 in future lost wages, $38,000 in past medical expenses, $35,000 in future medical expenses, and $100,000 for past and future pain and suffering.

        SO ORDERED.

Allyne R. Ross<br>
United States District Judge

Dated: March 1, 2006
       Brooklyn, New York

**SERVICE LIST:**

Attorneys for Plantiff
Andrew S. Wein
Trief & Olk
150 East 58th Street, 34th Floor
New York, NY 10155

Barbara E. Olk
Trief & Olk
150 East 58th Street
New York, NY 10155

Defendants:

Defendant Newell Industries, Inc.:
Newell Industries, Inc
c/o David A. Newell, Jr.
1226 Highview Terrace
Cheshire, CT 06410

Attorney for Defendant Rockford Systems, Inc.:
Joe F. Handler
55 West Wacker Drive - Suite 950
Chicago, IL 60601

Attorney for Defendant Stamptech, Inc.:
Frank Spano
Hogan & Hartson, LLP
875 Third Avenue
New York, NY 10022

cc: Magistrate Judge Robert M. Levy

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOSE VILLALBA,

        Plaintiff,                                    REPORT AND
                                                    RECOMMENDATION
                                                    02-CV-4455 (ARR) (RML)

        -against-

ROCKFORD SYSTEMS, INC., STAMPTECH, INC.,
and NEWELL INDUSTRIES, INC.,

        Defendants.
------------------------------------------------------------------X

LEVY, United States Magistrate Judge:

        By order dated September 24, 2004, the Honorable Allyne R. Ross, United States District Judge, issued a default judgment against defendant Newell Industries, Inc. ("Newell") and referred the matter to Magistrate Judge A. Simon Chrein to conduct an inquest on damages. The case was reassigned to me on April 11, 2005. I conducted a factual hearing on July 26, 2005, at which plaintiff Jose Villalba ("plaintiff") testified. For the reasons stated below, I respectfully recommend that plaintiff be awarded $305,000 in compensatory damages.

## BACKGROUND AND FACTS

        Plaintiff commenced this action in the Supreme Court of the State of New York, Kings County in June 2002 against Rockford Systems, Inc., Stamptech, Inc., and Newell. The case was removed to this court in August 2002. Plaintiff reached agreements with Rockford Systems, Inc. and Stamptech, Inc., and the action against those parties was voluntarily dismissed without prejudice. After Newell, the remaining defendant, failed to appear or answer the complaint, Judge Ross issued a default judgment against it and referred the case for a Report and Recommendation on damages. (See Order, dated Sept. 24, 2004.)

According to plaintiff, Newell is a foreign corporation with its principal place of business in Waterbury, Connecticut. (See Complaint, dated June 3, 2002 ("Compl."), ¶ 3.) Newell allegedly manufactured, designed and sold portions of the machine that injured plaintiff (id. ¶¶ 17-19), and was "responsible for the installation, inspection, refurbishing, rebuilding, repair, maintenance, and/or service of the Machine." (Id. ¶¶ 20, 21.) Plaintiff alleges that the machine was defectively designed and manufactured and that his injuries were caused by a defect in the machine as well as Newell's failure to provide adequate warnings. (Id. ¶¶ 31-35.) He also alleges that his injuries were caused by Newell's negligence and breach of warranties. (Id. ¶¶ 37, 39.)

It is well established that a party's default constitutes an admission with respect to all well pled allegations of liability. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992); Top Rank Inc v. Tacos Mexicanos, No. 01-Civ-5977, 2003 WL 21143072, at *2 (E.D.N.Y. Mar. 28, 2003); In re Crazy Eddie Sec. Litig., 948 F. Supp. 1154, 1160 (E.D.N.Y. 1996). Therefore, the court accepts as true all allegations in the complaint, save for those addressing plaintiff's entitlement to damages. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); Credit Lyonnais Sec. Inc. v. Alacantara, 183 F.3d 151, 154 (2d Cir. 1999). The court must instead conduct an inquiry to ascertain, with reasonable certainty, the amount of damages, if any. See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997). In this case, the court held a hearing on damages and Newell, having defaulted, failed to appear or present evidence. The evidence at the inquest hearing included the testimony of plaintiff, medical records, and wage and earnings records.

The evidence established the following:

        Plaintiff was employed by Flushing Metal Partition, a factory division of Acme Architectural Products in Maspeth, New York. (Transcript of Hearing, dated July 26, 2005 ("Tr."), at 4; Villalba Motion for Default, dated Aug. 16, 2004, Ex. A, ¶ 5.)[1] On December 19, 2001, he was using a punch press to cut iron. Although he had been working there for two years, this particular day was the first time he had operated the punch press machine and no one had trained him to use it properly. (Id. at 17.) The machine is operated by pressing a pedal that releases the blade, which plaintiff described as approximately fifteen to twenty centimeters above a hole that collects the cut pieces of iron. (Id. at 15-16.) After operating the punch press for a period of time, plaintiff removed his foot from the pedal and shut off the machine. He then began to remove the pieces of discarded metal that filled the hole in an effort to clean the machine. (Id. at 16.) According to plaintiff, who testified through an interpreter:

> I stopped [the machine]. I shut it off. I removed my foot and . . . I began to clean the hole. And before I knew it, the blade came down on me.

(Id.) Plaintiff stated that the blade severed the top portions of the index and middle fingers of his left, dominant hand. (Id. at 6-7.)

        Plaintiff was taken to Bellevue Hospital for treatment and was released after eight hours. (Id. at 7.) He stated that after his release from the hospital, he "did not go out of [his] house for about 15 days." (Id.) Since November 5, 2002, he has been under the care of Dr.

---

[1] Although plaintiff testified that the factory was in Fresh Meadows, New York (Tr. at 4), plaintiff's Motion for Default indicated that the company was in Maspeth.

Ignatius Roger, a plastic surgeon. (Affidavit of Jose Villalba in Support of His Claim for Damages, sworn to Nov. 10, 2004 ("Villalba Aff."), Ex. E, ¶ 4; Inquest Ex. 3) Dr. Roger revised amputations of those fingers on December 4, 2003. (See Inquest Ex. 3.) Following the surgery, plaintiff attended therapy in an attempt to decrease the hypersensitivity of the injured fingers and restore motion. (Id.) Dr. Roger recommended a treatment of stellate ganglion block injections with additional therapy, medication and periodic medical monitoring.[2] (Id.) The doctor advised that in the event this treatment is unsuccessful, plaintiff may require a more aggressive treatment of a trial spinal cord stimulator. (See Inquest Ex. 3.) He further suggested that if the trial stimulator is beneficial, a permanent one may be implanted, which would require additional therapy and medication. (Id.)

Plaintiff testified that he has experienced constant pain in his left hand, and suffers from anxiety and depression as a result of the accident. (Tr. at 8.) In addition to Dr. Roger, plaintiff testified that he has been under the care of Dr. Michael Hearns for pain management, including the proposed treatment of stellate ganglion block injections.[3] (Id. at 9;

---

[2] A stellate ganglion block (sympathetic block) is an injection of local anesthetic into the front of the neck that is typically ordered for pain located in the head, neck, chest or arm caused by sympathetically maintained pain. Harvard Medical School, Brigham and Women's Hospital Pain Management Center, http://www.hmcnet.harvard.edu/brighampain/faqs/stellate.html (last visited Nov. 18, 2005).

[3] The date on which plaintiff began seeing Dr. Hearns is unclear as plaintiff did not introduce Dr. Hearns's records. It is also unclear whether the injections were proposed by Dr. Hearns or Dr. Roger. (Inquest Ex. 3, ¶ 4, ¶ 5; Tr. at 9.) However, Dr. Matthew Clarke at Central Medical Services of Westrock signed the request form for the stellate ganglion block injections that were mentioned in Dr. Roger's letter and at the hearing. (See Kingsbrook Hosp. Records, dated Mar. 21, 2005.) The injections were approved by Liberty Mutual on June 1, 2005. At the time of the inquest, it was unclear whether plaintiff had started receiving the injections or was
(continued...)

-4-

Inquest Ex. 3.) Additionally, plaintiff was hospitalized for one day at Kingsbrook Jewish Medical Center on March 24, 2005. (See Inquest Ex. 3; Kingsbrook Hosp. Records, dated Mar. 24, 2005.) While at Kingsbrook, plaintiff was under the care of Dr. Curt Fenkl, who treated him for anxiety and discharged him. (Kingsbrook Hosp. Records, dated Mar. 24, 2005.)

At the hearing, plaintiff placed in evidence four photographs depicting the current physical condition of his left hand. (Villalba Aff., Ex. D.) He testified that he has been unable to engage in any form of work since the accident, and that he has difficulty engaging in everyday activities because of his diminished capacity for holding and grasping objects. (Tr. at 8, 13, 20.) Plaintiff takes daily medication to address symptoms of depression and anxiety, as well as a daily pain reliever. (Inquest Ex. 3; Tr. at 8-9.) Although plaintiff has not yet attained maximal medical improvement, Dr. Roger's prognosis is that with continued therapy and medication, plaintiff's hand will likely improve, and he will be able to work in some capacity. (Inquest. Ex. 3; Tr. at 19.) Plaintiff speaks little English and has completed only two years of high school. Prior to working at the factory, he sold vegetables and worked as a glass cutter. (Tr. at 19-20.)

With respect to his current condition, plaintiff testified that he is in constant pain, that his hand is consistently swollen, and that there has been no improvement since the accident. (Tr. at 8, 12, 14.) He stated that he suffers from anxiety and insomnia as a result of his injury, and that he continues to experience bouts of depression and shame. (Id. at 8, 21.) Before the accident he often performed tasks in his home, including cooking and cleaning; he also played

---

[3](...continued)
about to begin receiving them. (Tr. at 9-10, 19; Inquest Ex. 3.)

football, soccer, and volleyball and spent considerable time with his children (now ages 11 and 14) in the park. (Id. at 8, 18.) Plaintiff testified that he can no longer take part in these activities: "[M]y arm is no longer any good. My fingers are missing. I go out into the street and I cover my hand . . . . I am ashamed." (Id. at 21.)

At the time of the accident, plaintiff was earning $442.75 per week, with an annual income (after taxes) of around $20,000. (Inquest Ex. 1.) It has been four years since the accident, and his lost income totals approximately $82,000. (Tr. at 31.) His medical expenses to date are $37,738. (Inquest Ex. 4.) Since the accident, workers compensation provided by Liberty Mutual, which has a lien on the judgment in this case, has covered plaintiff's medical expenses and lost wages. (Id.)

Plaintiff seeks approximately 1.4 million in compensatory damages, as follows: $82,000 in lost wages, $500,000 in future earnings, $37,738 for past medical expenses and $200,000 for future medical expenses, $200,000 for past pain and suffering, and $400,000 for future pain and suffering. (See Plaintiff's Memorandum of Law in Support of Plaintiff's Request for Damages, dated Nov. 10, 2004, at 4-5.)

## DISCUSSION

Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct. Cooper Indus. Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432 (2001) (citing Restatement (Second) of Torts § 903 (1979)). However, calculation of monetary compensation for a physical injury is typically an inexact science that must be contained within objective limits. See, e.g., Cochran v. A/H Battery Assoc.,

909 F. Supp. 911, 917 (S.D.N.Y. 1995). When damages for personal injuries cannot be precisely calculated, the determination of an appropriate award is left to the sound discretion of the trier of fact. (Id.)

The loss of a digit, or in this case parts of two digits, is unquestionably serious but difficult to translate into precise monetary terms. Generally, the factors courts consider in determining damages for an amputation are: (1) the nature and extent of the amputation, (2) the plaintiff's occupational status at the time of the amputation, (3) the plaintiff's past and future medical expenses, (4) the extent of the plaintiff's recovery, and (5) the plaintiff's general mental and physical condition before and after the amputation, including physical and mental suffering. Williams v. United States, 747 F. Supp. 967, 1011 (S.D.N.Y. 1990) ($500,000 pain and suffering award for prisoner as a result of prison hospital's negligence in treating a foot infection that led to a below-the-knee amputation). Plaintiff seeks compensation for pain and suffering, medical expenses, and lost wages. Each element of damages will be addressed in turn.

I. Past and Future Pain and Suffering

Damages for pain and suffering are especially difficult to quantify and vary greatly depending on the facts and circumstances of each case. In fashioning an appropriate award, courts typically consider the decisions of other court and jury verdicts involving similar injuries. For example, in Madden v. Nassau County, 498 N.Y.S.2d 856, 857 (2d Dep't 1986), the court reviewed a jury verdict of $50,000 for a six-year-old girl who suffered a partial amputation of her ring finger as the result of an ice skating accident. In upholding the verdict,

the court took note that, as result of the injury her hand was permanently deformed, she was in constant pain, and she had become introverted and subject to mood swings. In Fields v. CUNY, 628 N.Y.S.2d 76, 77 (1st Dep't 1995), the court sustained an award of $400,000 to a 14-year-old girl who was injured when a circular saw came in contact with her non-dominant hand, requiring the amputation of a third of her ring finger and resulting in extensive nerve damage, decreased sensation in two of her other fingers, loss of function, and mental suffering. See also Rios v. Victor-Balata Belting Co., No. 99-Civ-6223, 2002 WL 31887438 (E.D.N.Y. May 31, 2002) (settlement of $897,842 to 31-year-old bagel store worker who required partial amputations of the second and fifth fingers of the right hand as a result of defective design of bagel machine); Rodriguez v. Precision Screen Machines, No. 97-Civ-4214, 1999 WL 33485261 (E.D.N.Y. May 27, 1999) (settlement of $1.15 million to 34-year-old machine operator who suffered severe injuries because of a design defect that caused his hand to be caught in a drum transfer machine for 15 minutes in 400 degree heat, resulting in severe burns to his non-dominant hand and requiring (1) a groin flap procedure whereby the hand was sewn into his body to grow new skin, (2) seven additional surgeries to form a hand, and (3) partial amputation of three fingers); Arbaiza v. Delta Int'l Mach. Corp., No. 96-Civ-1224, 1999 WL 33489452 (E.D.N.Y. Mar. 9, 1999) (settlement of $190,000 to compensate worker for partial amputation of index and ring finger of dominant hand as the result of a defective table saw); Hines v. Harris Intertype Corp., No. 14946/90, 2000 WL 33708232 (Sup. Ct. Kings County, Jan. 17, 2000) (settlement of $407,500 to 15-year-old who suffered amputation of the right index finger and partial amputation of the middle, ring and little fingers of his right hand as a result of an accident on a

die cutting machine.); Cecere v. 3950 Blackstone Assoc., 656 N.Y.S.2d 242, 243 (1st Dep't 1997) (pain and suffering award increased to $175,000 for 22-year-old whose index finger on his dominant hand was caught in a door and severed just below the first knuckle).

Plaintiff testified that he has suffered from constant pain since the accident and is unable to engage in any meaningful occupation or physical recreation. His hand is permanently deformed, and he suffers from feelings of anxiety, depression and shame as a result of the accident. At the same time, he is otherwise healthy and relatively young and retains the full use of his non-dominant hand. Although plaintiff testified that he is currently unable to work, play with his children, or help around the house, Dr. Roger's prognosis is that he will regain function in the injured hand and be able to lead a relatively normal life. In short, plaintiff suffered a painful and emotionally traumatic injury that has limited his ability to enjoy life but that will likely diminish in severity with the passage of time. Accordingly, I recommend that plaintiff be awarded $50,000 for past pain and suffering and $50,000 for future pain and suffering.

II. Lost Wages and Future Earnings

Plaintiff testified that he has been unable to work since the accident. In support of his claim for lost earnings, plaintiff presented evidence of his earnings at the time of the accident, an invoice from Liberty Mutual for lost wages and medical expenses, and a letter from his treating surgeon, Dr. Roger, attesting to his inability to work. Having reviewed the testimony and supporting documents, I find that plaintiff is entitled to an award of $82,000 for past lost wages.

With respect to future earnings, plaintiff has an anticipated work life of

-9-

approximately 17 years from this date. See Vol. 1B, N.Y. Pattern Jury Instructions, 3d ed. 2005, Table 2, Appendix B. In awarding damages for future lost earnings, the court must take into consideration the nature and extent of plaintiff's injuries as well as his physician's prognosis that he will be able to resume work and lead a relatively normal life. Although the nature of plaintiff's injury precludes him from returning to his previous occupation, he testified that he had previously engaged in other forms of employment, including selling vegetables. I find that an award of $50,000 would reasonably compensate him for lost wages as his medical condition continues to improve to the point where he may return to gainful employment.[4]

### III. Past and Future Medical Expenses

Plaintiff has presented proof that he received medical treatment the day of the accident and has continued to receive various forms of medical assistance, including physical therapy, follow-up care with Dr. Roger, psychiatric medication, and pain management.[5] He introduced into evidence copies of the bills and invoices from the various care providers. Having reviewed the documents, I recommend that plaintiff be awarded $38,000 for past medical expenses.

---

[4] At an approximate income of $20,000, this award would compensate him for about two and one-half years. Although the record does not establish with certainty how long plaintiff will likely be unable to work due to the amputation, the court's analysis of the medical evidence suggests that a period of two and one-half years is a reasonable estimate, as plaintiff has retained the full use of his non-dominant hand.

[5] At the hearing, plaintiff testified that he had not sought out psychological treatment or therapy. (Tr. at 21.) However, Dr. Roger's letter of July 22, 2005 stated that plaintiff was under the care of a doctor for psychological treatment and that such treatment was necessary. (Inquest Ex. 3.)

With respect to future medical expenses, Dr. Roger is considering the possibility of additional therapies and treatments. These expenses are contingent on the extent to which plaintiff responds positively to current treatment and the cost of alternative measures. To date, plaintiff's medical expenses include examination by Dr. Roger every six to eight weeks, physical therapy, and medication for his physical and emotional distress.[6] Plaintiff has requested $200,000 for future medical expenses.[7] This request is not supported by evidence in the record and should be reduced.[8] See, e.g., Marcoux v. Farm Serv. and Supplies, Inc., 290 F. Supp. 2d 457, 479-80 (S.D.N.Y. 2003) (reducing $165,000 award for future medical expenses because plaintiff's evidence of probable future expenses, which included four proposed surgeries, amounted to $50,000). See also Sanvenero v. Cleary, 640 N.Y.S.2d 174, 175 (2d Dep't 1996). Nonetheless, in view of the physical pain and emotional distress plaintiff has continued to experience since the accident, it is reasonable to assume that plaintiff will incur significant medical expenses related to his condition for the foreseeable future. Although it is

---

[6] Although plaintiff did not provide any specific evidence as to the cost of physical therapy, the court finds $75 per session to be reasonable. Similarly, the reasonable out-of-pocket cost of an office visit to Dr. Roger is approximately $100. Plaintiff did not introduce evidence of the cost of his medications.

[7] A letter dated April 15, 2003 from a Liberty Mutual orthopedic surgeon stated that maximum medical improvement had not yet been achieved and that plaintiff should continue occupational therapy and physical therapy three times per week for six to eight weeks. (Bellevue Hosp. Records, dated Apr. 15, 2003.) That was approximately two and half years ago.

[8] During the inquest, plaintiff's attorney informed the court that Dr. Roger was unable to provide the cost of future medical expenses because it depends on "how these injections go forward, whether he's just going to need the pain management and medicine or if he's going to need future surgeries . . . ." (Tr. at 32.)

-11-

difficult to quantify with precision the cost of these services or the length of time they will be needed, the court can make an informed evaluation based on the cost of the services he currently receives, the severity of his condition, and the opinion of Dr. Roger that he will eventually be able to lead a somewhat normal life. I find it reasonable to conclude that plaintiff will need the services of a doctor and a mental health professional for the next five years. I therefore recommend an award of $35,000 in future medical expenses.[9]

## CONCLUSION

---

[9] This calculation assumes that plaintiff will have bi-monthly appointments with Dr. Roger ($50 monthly) and physical therapy twice a month (approx. $150), and will take medication (approx. $100 a month), assuming he remains on the current prescriptions. This brings the total to $300 a month, which equals $3,600 per year in medical expenses. In addition, he will likely need treatment for emotional distress, as Dr. Roger suggested, during some of that period, to treat his deep and continuing feelings of shame, anxiety and depression. Assuming that plaintiff uses $3,000 of mental health services annually for five years, an award of $35,000 would reasonably cover plaintiff's future medical care, and any additional incidental medical expenses, for approximately five years.

For the foregoing reasons, I respectfully recommend that plaintiff be awarded $82,000 in past lost wages and $50,000 in future lost wages; $38,000 in past medical expenses and $35,000 in future medical expenses; and $100,000 for past and future pain and suffering, for a total of $305,000. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Ross and to my chambers, within ten (10) business days. Failure to file objections within the specified time waives the right to appeal the district court's order. See 28 U.S.C § 636(b)(1); Fed. R. Civ. P. 72, 6(a); 6(e).

Respectfully submitted,

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
       February 10, 2006